STATE of Missouri, ex rel. Jeremiah (Jay) NIXON, Respondent,

v.

Harold E. ESTES, Appellant Pro Se.

No. WD 60796.

Missouri Court of Appeals, Western District.

June 30, 2003.

John Roger Cady, Platte City, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Jefferson City, Kenneth W. McCracken, Assistant, Attorney General Office, Kansas City, for Respondent.

RONALD R. HOLLIGER, Presiding Judge.

Harold Eugene Estes appeals the circuit court's ruling granting the Attorney General's motion for summary judgment in a civil action brought against him under the provisions of the Merchandising Practices Act ("MPA"), § 407.010 *et seq.*[1] We affirm the judgment of the circuit court.

This is a case of first impression involving the scope of the MPA as applied to non-Missouri consumers. It is evident from the briefs of the parties and the procedural history of this case that no material facts are in dispute. Estes was a resident of Clay County, and served as the sole officer, director, and shareholder of K.C. Dynamic Concepts, Inc. ("K.C.Dynamic"), a Missouri corporation that maintained its principal place of business in Clay County. Before and for some time after incorporating K.C. Dynamic, Estes also did business as the sole proprietor of Contemporary Marketing Services ("CMS"). CMS and K.C. Dynamic both sold, as "business opportunities," vending machines that dispensed over-the-counter medications such as aspirin, ibuprofen, and antacids. Estes personally directed, had knowledge of, authorized or personally participated in all the business activities of CMS and K.C. Dynamic, including drafting and distributing the sales scripts used to "pitch" consumers about the business opportunities the companies offered for sale.

Estes and his companies placed classified advertisements in newspapers throughout the United States. Interested consumers would call the toll-free telephone number listed in the ads, leave a message, and receive a return call from Estes or one of his salespeople and follow-up "information packets" by mail. During the telephone conversations, Estes and his salespeople would use the scripts Estes had prepared to cajole consumers into agreeing to purchase vending machines. Potential consumers were assured, among other things, that: (1) market research had been conducted in the consumer's area to confirm local demand for the vending machines; (2) based on their market research, each of the machines being sold averaged eighteen vends per day; and (3) based upon the "national average," consumers purchasing the machines would make tens of thousands of dollars in "net

---

1. Unless otherwise indicated, all statutory references are to RSMo 1994, which was the law in effect at the time of Estes' actions. However, there have been no relevant changes in the statutes discussed in this opinion since then.

profit" per year. These representations were false, deceptive, and intentionally misleading, and Estes knew them to be so when he prepared the scripts and distributed them to his sales staff.

During the course of Estes' business operations from early 1995 to mid-August 1997, at least forty-one consumers invested in vending machines sold by Estes and his staff from offices in Missouri. Each of those forty-one consumers invested anywhere from $5,000 to $30,000 apiece in reliance on the false and misleading representations made by Estes and his salespeople. Thirty-nine of the consumers who purchased vending machines from Estes were located in states other than Missouri.

None of the forty-one consumers ever averaged eighteen vends per day from any of the vending machines they purchased, nor did any of them receive either a refund or the net profits represented by Estes or his sales staff. Moreover, Estes and his business associates did not honor their promises to repurchase, resell, or "buyback" the consumers' vending machines and associated routes if they did not make a profit. The consumers lost the money they had invested in the machines, and several of them lost additional sums they spent on shipping fees, advertising costs, and other consequential damages.

After receiving and investigating numerous consumer complaints, the Attorney General ("State") filed a civil suit against Estes and K.C. Dynamic, alleging multiple violations of section 407.020.1 of the MPA and seeking several forms of relief, including entry of a permanent injunction and an

order of restitution, as authorized by sections 407.100.1 and 407.100.4, respectively. Shortly after Estes pleaded guilty to criminal charges arising from those alleged violations,[2] the State promptly moved for summary judgment in its civil suit. The circuit court granted summary judgment and awarded the State a permanent injunction and restitution. Estes brought an appeal challenging the entry of summary judgment against him, and this court reversed and remanded on the ground that two critical exhibits tendered by the State in support of its motion for summary judgment (namely, excerpts of testimony from Estes' guilty plea hearing and the criminal trial of one of his salespeople, Daniel Simpson) were not certified as required by Missouri law. *See State ex rel. Nixon v. Estes*, 41 S.W.3d 25 (Mo.App.2001).

On remand, the State presented a second motion for summary judgment with properly certified copies of the two exhibits. The circuit court granted the State's second motion for summary judgment, entering an award of restitution in the amount of $527,062.06 and issuing a permanent injunction prohibiting Estes and K.C. Dynamic "from selling, leasing, or offering or attempting to sell or lease, in or from the state of Missouri, any products, equipment, supplies, or services for the purpose of enabling any potential purchaser thereof to start or operate any business," whether they are "acting on their own behalf or as an agent or independent contractor of another."

Estes raises only one point on appeal,[3] in which he contends the circuit court erred as a matter of law in granting the

---

**2.** Section 407.020.3 states: "Any person who willfully and knowingly engages in any act, use, employment or practice declared to be unlawful by this section with the intent to defraud shall be guilty of a class D felony." Estes is currently serving a ten-year prison sentence imposed after his guilty plea.

**3.** Although Estes briefed a second point, his attorney explicitly abandoned it during oral argument of this case.

State's second motion for summary judgment, further arguing that the MPA was not intended to apply to consumers located outside Missouri or to business conducted outside Missouri. He does not contest the grant of summary judgment regarding the two Missouri resident consumers.

If there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *Daniels v. Senior Care, Inc.*, 21 S.W.3d 133, 135 (Mo.App. 2000). As the facts here are uncontroverted, the dispositive issue in this appeal, which is entirely a question of law, is whether the circuit court correctly interpreted and applied the MPA in reaching its conclusion that the State was entitled to judgment as a matter of law.[4] *See Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 239 (Mo. banc 2001).

■■■ When interpreting a statute, this court is to ascertain the intent of the legislature from the language used and give effect to that intent, if possible. *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 19 (Mo. banc 1995). We are also required to consider and give meaning to all of the terms used in a statute. *Habjan v. Earnest*, 2 S.W.3d 875, 882 (Mo.App.1999). Words employed in a statute are given their usual and ordinary meaning unless the legislature itself has defined a particular term or phrase. The statutory definition "should be followed in the interpretation of the statute to which it relates and is intended to apply and supersedes the com-

monly accepted dictionary or judicial definition and is binding on the courts." *In re Estate of Hough*, 457 S.W.2d 687, 691 (Mo. 1970). "If the statutory terms are plain and clear to one of ordinary intelligence, they are not ambiguous and there is no need to resort to rules of statutory construction." *Bartareau v. Executive Bus. Prods., Inc.*, 846 S.W.2d 248, 249 (Mo.App. 1993).

Section 407.020.1 states, in pertinent part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, *in or from the state of Missouri*, is declared to be an unlawful practice.

(Emphasis added.) Section 407.010(7) further provides that as used in sections 407.010 to 407.130, the words "trade" or "commerce" mean:

> [T]he advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value *wherever situated*. The terms 'trade' and 'commerce' include any trade or commerce directly

---

4. Estes' point relied on frames the issue in terms of the circuit court's claimed lack of subject-matter jurisdiction to grant the restitutive relief requested by the State. As correctly noted in Estes' brief, subject-matter jurisdiction concerns "the nature of the cause of action or the relief sought" and exists only when the court " 'has the right to proceed to determine the controversy or question in issue between the parties, or grant the relief prayed.' " *Cantrell v. City of Caruthersville*, 359 Mo. 282, 221 S.W.2d 471, 476 (1949) (citation omitted). However, during oral argument of this case, Estes' attorney explained that he was "not really arguing" along those lines, but in terms of statutory interpretation. Either way, the question of the propriety of summary judgment is purely one of law which we determine *de novo*.

or indirectly affecting the people of this state.

(Emphasis added.) The Supreme Court of Missouri has observed that the unfair practices declared unlawful by section 407.020.1 are "unrestricted, all-encompassing and exceedingly broad. For better or worse, the literal words [of the statute] cover every practice imaginable and every unfairness to whatever degree." *Ports Petroleum*, 37 S.W.3d at 240; *see also* 15 CSR 60–8.020(1) (defining an "unfair practice" very broadly).

■ As he must, Estes admits that he willfully engaged in deceptive practices prohibited by section 407.020.1, and that he did so with the intent to defraud his victims. His argument is that section 407.020.1 requires that the deception occur during a course of conduct involving "the sale or advertisement of any merchandise in trade or commerce," which under the definition provided in the second sentence of section 407.010(7) applies *only* to deceptive conduct which "directly or indirectly affect[s] the people of this state." In other words, Estes claims the definition of the terms trade or commerce contained in the second sentence of section 407.010(7) acts to restrict the scope of section 407.020.1 to deceptive practices which affect, directly or indirectly, the people of the State of Missouri. As such, he contends the trial court erred in ordering him to pay restitution for any of the financial losses suffered

by non-Missouri residents resulting from his illegal merchandising practices.[5] Estes therefore asks that we reverse the trial court's judgment to the extent it requires him to pay restitution to the State on behalf of the thirty-nine non-Missouri residents he swindled.[6]

In support of his argument, Estes cites two cases decided by the appellate courts of Illinois and Massachusetts,[7] as well as several diversity jurisdiction cases decided by various federal trial and appellate courts attempting to divine how those two states' highest courts would rule on the issue of whether or not their respective consumer fraud statutes apply to out-of-state consumers or to business conducted out-of-state. It suffices to observe that, despite the claim in Estes' brief that the statutes construed in those cases were "framed essentially identical to" Missouri's MPA, none of those decisions involved statutes containing language identical to that found in sections 407.020.1 and 407.010(7).[8] Consequently, they provide this court no useful guidance. *See, e.g., State ex rel. Mo. Pac. R.R. Co. v. Koehr*, 853 S.W.2d 925, 927 (Mo. banc 1993). Furthermore, the Illinois decision Estes cites for its holding that, in a class action proceeding under Illinois's Consumer Fraud and Deceptive Business Practices Act, Illinois had no authority to regulate out-of-state transactions affecting non-Illinois citizens and had no interest in doing so,

---

5. At oral argument, Estes' attorney conceded the correctness of the judgment rendered against Estes for the losses suffered by the two victims that were Missouri residents.

6. *See* section 407.100.4, which places upon the Attorney General the duty "to distribute such funds to those persons injured."

7. *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (banc 1985) and *Oliveira v. Amoco Oil Co.*, 311 Ill.App.3d 886, 244 Ill.Dec. 455, 726 N.E.2d 51 (2000).

8. For example, the Massachusetts Consumer Protection Act, which was interpreted in many of the state and federal cases relied on by Estes, precludes the filing of a civil suit under the Act "unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially *within* the commonwealth." Mass. Gen. Laws ch. 93A, § 11 (2003) (emphasis added). Missouri obviously has no comparable statute.

*Oliveira v. Amoco Oil Co.*, 311 Ill.App.3d 886, 244 Ill.Dec. 455, 726 N.E.2d 51 (2000), was nullified by the Supreme Court of Illinois after Estes' opening brief was submitted. *See Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (banc 2002). Although the Supreme Court of Illinois found it unnecessary to address the merits of the plaintiff's request for class certification (including, in particular, the issue of whether the Illinois anti-fraud statute applied to non-resident consumers), it indicated that the lower court's statements and holdings with respect to the appropriateness of class certification were "wholly advisory," and vacated those portions of the appellate court's judgment addressing that issue. *Id.* at 158–59, 165.

More importantly, Estes' interpretation incorrectly assumes that because the General Assembly defined the terms trade or commerce to *"include* any trade or commerce directly or indirectly affecting the people of this state" in the second sentence of section 407.010(7), those two terms mean *only* economic activity having such effects. While the plain meaning of the word "include" may vary according to its context in a statute, it is ordinarily used as a term of enlargement, rather than a term of limitation. *St. Louis County v. State Highway Comm'n*, 409 S.W.2d 149, 152–53 (Mo.1966). In our view, the definition of trade or commerce in the second sentence of section 407.010(7) simply makes clear the intent of the General Assembly that the terms should be understood to include, but not necessarily be limited to, economic

activity which has a direct or indirect effect on the people of this state. Therefore that definition does not, as argued by Estes, evince a legislative intent to restrict the application of section 407.020.1 to consumer victims domiciled within Missouri or to business transacted entirely within the state's territorial borders. Our conclusion is further supported by the extremely wide scope of the MPA as a whole, as well as the very broad definition of "trade" or "commerce" contained in the first sentence of section 407.010(7), which says the two words mean "the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value *wherever situated.*"

Finally, Estes' interpretation of section 407.020.1 ignores the prepositional phrase "in or from the state of Missouri," which modifies the prepositional phrase "of any merchandise in trade or commerce." [9] As we read the statute, if a deceptive act is used or employed "in connection with the sale or advertisement of any merchandise in trade or commerce ... *in or from the state of Missouri,*" it is unlawful under section 407.020.1. Accordingly, it is not so much the definition of "trade or commerce" which ultimately establishes the reach of section 407.020.1 as it is its requirement that the trade or commerce originate or occur "in or from the state of Missouri." [10]

Applying our analysis to the facts in the case at bar, we believe it is beyond cavil that the merchandise Estes deceptively ad-

---

**9.** It also modifies the noun "solicitation" contained in the clause "the solicitation of any funds for any charitable purpose, as defined in section 407.453," but we are not concerned with that portion of the statute here.

**10.** Seizing on a few case-specific factual statements in *State ex rel. Nixon v. Beer Nuts Ltd.*,

29 S.W.3d 828, 835 (Mo.App.2000), Estes also claims that "in or from the state of Missouri" actually means "in *and* from the state of Missouri." However, a close reading confirms that the case in no way stands for that proposition and has no application here.

vertised and sold was "in trade or commerce ... in or from the state of Missouri." Contrary to the various claims made in Estes' brief, it matters not that most of the victims of Estes' illegal merchandising practices were domiciled in states other than Missouri, that some of the events in the chain of fraudulent transactions he initiated took place in states other than Missouri, or that the incoming telephone number in the newspaper advertisements was toll-free. Estes established and operated his businesses in Missouri, placed the newspaper advertisements from company offices in Missouri, made telephone sales calls and mailed out information packets and purchase agreements for the vending machines and their contents from company offices in Missouri, received the signed sales agreements in Missouri, received wire transfers for hundreds of thousands of dollars in payments from his victims into Missouri bank accounts, and maintained a continuing commercial relationship with those victims from company offices in Missouri. The vending machines and their contents were also sold to Estes' Missouri businesses before they were shipped to the consumer victims by the corresponding manufacturers. These facts were more than sufficient to confer subject matter jurisdiction upon the circuit court, under section 407.100, to consider and grant the relief sought by the State. Moreover, we hold that the circuit court properly interpreted and applied the MPA in ruling that the State was entitled to summary judgment.

Anticipating this result, Estes argues at some length in his reply brief that unless we adopt his interpretation of sections 407.020.1 and 407.010(7), Missouri will be allowed "to project its legislation into other states in contravention of the Commerce and Supremacy Clauses" of the United States Constitution. While we think this is unlikely,[11] that is for a future court to determine based on the claims of different parties and a different set of facts.

The judgment of the circuit court is affirmed.

PAUL M. SPINDEN, Judge, and JAMES M. SMART, JR., Judge, concur.

---

11. Though we do not decide the issue, it would seem that the limiting clause "in or from the state of Missouri" would provide the required local nexus to prevent section 407.020.1 from being applied on a wholly extraterritorial basis. *See, e.g., Maberry v. Said,* 911 F.Supp. 1393, 1399, 1403–04 (D.Kan.1995).